## BELKNAP v. BOSTON & MAINE RAILROAD.

When there is neither fraud, malice, gross negligence or oppression, damages will be confined to compensation for the plaintiff's injury.

In such cases the character, standing, condition or circumstances of the defendant, are entirely immaterial.

But when exemplary or punitory damages are to be given, the condition and circumstances of the defendant may be material. What would be sufficient damages by way of example and of punishment for a day laborer without means, would be nothing by way of punishment or example to a wealthy corporation.

Excessive damages are good ground for setting aside a verdict, when from their exorbitancy, the court may reasonably presume that the jury in assessing them, were influenced by passion, partiality, prejudice or corruption. So a verdict will be set aside when the damages are too small, as well as when they are too large.

When the verdict is set aside on the ground of excessive damages, the court, instead of simply ordering a new trial, will give the plaintiff the option of reducing the verdict to the sum, which the court consider reasonable, and upon his remitting the excess, will give him judgment for the residue, and deny the motion for a new trial, and this in actions of tort is well as upon contract.

TRESPASS, by Wm. H. Belknap against the Boston & Maine Railroad, for an assault upon the plaintiff, on the twenty-fifth day of June, 1867, and ejecting him from defendant's cars, at Melrose, in the state of Massachusetts, while lawfully riding therein, on his passage from Boston to Exeter, causing him detention from his business, and subjecting him to expense and great mortification.

There are three counts in the declaration, one of which is for a common assault and battery. The defendant pleads the general issue, which was joined, also a special plea, alleging that the plaintiff entered the cars at Boston, to go to Exeter, without having procured the usual ticket, and without having paid any fare; that the railroad requested him to pay the reasonable and usual fare of one dollar and fifty cents, to which defendant was entitled, but plaintiff refused to do so, or to pay any fare; and defendant then informed him that he must pay the fare or leave the cars; and upon his persisting in his refusal to pay the fare, and refusing to leave the cars, as requested, and unlawfully remaining in the cars, without the leave or license of the defendant, the defendant gently laid his hands upon the plaintiff, and removed him from the cars, using no unnecessary force. To this plea the plaintiff filed six replications, all but the fifth concluding to the country, and issue joined upon them. The fifth replication alleged that the plaintiff was rightfully riding from Boston to Exeter by the leave·and license of the defendant, and concluded with a verification, and an issue was made upon that. It appeared in evidence, that there was a masonic celebration in Boston on the 24th day of June, 1867, and the plaintiff purchased tickets from Exeter to Boston and back, at half price, paying therefor $1.50, the usual price of ticket one way. The return ticket was substantially as follows: Boston & Maine Railroad—Special Ticket—Masonic Celebration. Boston, Monday, June 23, 1867. Good for one passage between Boston and Exeter; signed Wm. Merritt, Sup't, and the other part was precisely like it, except it read good for one passage between Exeter and Boston.

The plaintiff testified, that he went to Boston Monday morning, on the down ticket, and attended the celebration; that he came back to the depot of that road in Boston, in season to take the last train of the same day to Exeter, which was at five o'clock, P. M.; that he intended to return by that train if he could find room, but that the cars were so crowded, both inside and upon the platforms, that he could not do so, and he therefore stopped over in Boston, until the next day at twelve o'clock, when he took his seat in the cars for Exeter; "that he went to the depot undecided whether to return home or not, but should have gone, could he have found a good seat, but could not, and so preferred to wait over. It appeared, that one train of cars left Boston for Exeter early the next morning." That when the conductor called upon him for his fare he offered this ticket, which the conductor refused to accept, but required him to pay the fare of $1.50, or leave the cars; and upon his refusal to do either, the conductor took him by the collar, and led him out of the car and

left him on the platform at Melrose station; that he thereupon returned to Boston, went to the office of the superintendent, showed him the ticket, and asked him if it was good for a passage to Exeter, and the superintendent told him it was; he then asked him why he was put off the train if the ticket was good, and Mr. Merritt, after some pause, asked him where the ticket came from, and he said from Mr. Parker, and asked if he knew him, and Mr. Merritt said yes, and said he let him have the tickets. After some further talk, Merritt told plaintiff to call again at three o'clock, and it should all be made right; that he did call at that time, but did not find Mr. Merritt there; that he, however, returned to Exeter in the three o'clock train that afternoon, and the conductor received this ticket for the fare. "Mr. Merritt testified that the plaintiff showed him his ticket, but he had no recollection of telling him that the ticket would be good that day, and plaintiff seemed to be nettled, and he told him he would arrange to have him go on at the three o'clock train; that he was called out before three o'clock, but had previously given orders to take plaintiff on this ticket. He also testified that the Exeter tickets, were furnished to Mr. J. D. Parker, by his clerks, and that he was accountable for them, and that on Saturday evening he had a talk with Parker just as he was going home, and he said one or two of his friends wished to stay over night, and he wanted them to stay, and asked if they might do so, and go home on those tickets; that at first he told them no, as it would make difficulty, but afterwards told him as a special favor to him, he would consent, it being understood that they were to return the next morning."Chapman and Harvey, who had tickets similar to plaintiff's and were put off the same train, both testify that they accompanied the plaintiff to Mr. Merritt's office, and plaintiff showed him his ticket, and asked if it was good, and Mr. Merritt said it was."

The plaintiff further testified, that when he showed his ticket to the conductor, Hamilton, he told him it was not good, and upon being asked why, he said it ought to have been used the day before. That he then told Hamilton he bought the ticket in good faith, with the understanding that he could return on Monday or Tuesday, but he refused to take it, and told plaintiff he had instructions from the superintendent not to take those tickets that day; that the conductor came again, and said that ticket would not do, and plaintiff must pay $1.50, or get off the train; he told him he believed it was good as he bought it for a good one, and did not propose to leave the train and the conductor thereupon said that he must pay $1.50, or get off the train, or he would put him off. That plaintiff then asked him, if he would step back into the next car and see Mr. Parker, as he was the one who procured the tickets; that the conductor replied that he knew nothing of Mr. Parker and plaintiff must pay $1.50, or get off the train, or he would put him off; plaintiff told him he should not get off till he was obliged to; that it was necessary he should be at home that train, and he believed his ticket was good. Upon being asked by the conductor, if he should resist, he told him he should make no particular resistance.

That a Mr. Chapman, who had a similar ticket, told the conductor not to put the plaintiff off; that he, Chapman, was a responsible man, and well known in Exeter; that on reaching Exeter they would see Mr. Smith, who was the station agent there, and if not all right he would be responsible for the pay. Plaintiff says Hamilton paid no attention to this, but took plaintiff by the collar, pulled him out of the seat, and led him through the car, keeping hold of him till he got him on to the platform at Melrose. He says the conductor led him the whole length of the car, which was a short smoking car, and full of passengers; that his expulsion caused quite a commotion in the train, which was a full one, and caused people to look out of the car windows, and that he was very much mortified. He says he was register of deeds, and receiving business continually during the the day, and that he posted a notice on his office door, that he should return by two o'clock on Tuesday P. M., but was unable to do so, by reason of being so expelled from the train.

" The plaintiff further testified that the conductor Hamilton used no ungentlemanly language—was as gentle as he could be. I told him I should not go out unless compelled. He pulled me up from my seat—I held back. I thought he used force to pull me along. He said he did not intend to leave the cars unless compelled to. He said he had often ridden in these cars upon the ordinary tickets, and that he did not inquire of any officer of the road whether *this* ticket was good on any day but Monday." "Mr. Hamilton, the conductor, testified that he asked plaintiff if he should resist, and he said no—but wanted him to take hold of him, and show his authority—that he took hold of his left arm, and he rose up and walked to the door, and he let go, and he walked out on to the platform—that he did not use any force, and plaintiff did not hang back." "Mr. Pettingill testified that he was present at the time, and that conductor took hold of plaintiff's arm or collar, and raised him up, and led him toward the door, and towards the platform. He did not have to exert much strength, perhaps seven to ten pound force." ·

The court ruled that the ticket did not, as matter of law, fix the time when the plaintiff was entitled to return,—that it did not contain the entire contract, but entitled the purchaser to a passage according to the reasonable rules and regulations of the railroad, as shown either by vote of the corporation, or by an established and existing usage, whether the plaintiff had notice of the usage or not, and the court so instructed the jury, and to these instructions the defendants excepted. Upon the subject of usage, there was testimony from the Superintendent who produced books showing a large number of special tickets issued by this corporation for a variety of occasions, such as picnics, excursions, fairs, military reviews, camp meetings, and meetings of corporations, sold at a reduced price,— generally at half fare. They were issued in various forms. For excursions from Boston to places not far distant, the tickets give the name and dates of the occasion, and state that the tickets are good for a passage in trains named, or good for a passage between places

named, and stating when the cars leave, going and returning. In other cases the ticket is marked " good for this day or train only," or its equivalent. Some of the tickets, although a small proportion of them, give the occasion and the date, and state that it is good for one passage between places named, without naming the train, and having any express limitation. Mr. Merritt testified that persons having those special tickets were allowed to pass over the road on those days only. If the occasion was to continue two or more days, the usage is to allow holders of those tickets to go and return on those days only. He says he don't know that any persons having these special tickets were allowed to pass on other days. That his orders confined them to the days named, and they were always carried out so far as he knew. He says if issued to attend a stockholders meeting at Salmon Falls, for instance, and they did not get through in time to return that day, on notice being given, the ticket would be extended, but it would not be good without further agreement. He also testified that there was no difference in the usage under tickets expressly limited, and those which were not—that the date governed the usage unless otherwise ordered. He said that the ordinary tickets of the road, although dated, we allow to be used on other days. As to the tickets for this occasion, he says he gave a general order to all the conductors that they were to be good on the 24th of June. Three of the conductors testified that these special tickets were received only on the day of the date, and that it made no difference in the usage whether there was any express limitation upon them or not. That the usage was invariably to go by the date. Conductor Aborn said he remembered only one exception, and that was when a train by accident failed to connect, and he took the tickets afterwards without orders, but reported himself; says he cannot say whether the special tickets did, or did not contain a limit to the day only, Conductor Smart says he don't remember any other tickets like these Exeter tickets. He says he was told by the Superintendent to go by the date and he did. He also said, that it is usually said on these tickets, " good for this day only." He says further that he took the Exeter tickets after the 24th of June; that he understood that the conductors had directions to take them after the plaintiff was put off the train.

The plaintiff also introduced the testimony, of Mr. Getchell, who says he returned from Boston on the 29th of June, and one of these return tickets was accepted for his fare by the conductor. There was testimony tending to prove that the tickets between Boston and Haverhill for this occasion were marked " good for this day only." The plaintiff was permitted to prove the character and duration of this celebration, and that it continued until after the last train to Exeter on that day; and to this the defendant excepted. The conductor, Hamilton testified that when requested by plaintiff to see Mr. Parker, he did step into the next car, and inquire of the other conductor, and was informed by him that he was not on the train. He says, also, that at that time he was running only between Boston and Haverhill, and was not going to Exeter.

The court instructed the jury that if there was existing at the time an established usage to take for a passage the special tickets at the time of their date only ; and that usage applied equally to cases where there was no express limitation on the ticket, as in the case in question, that usage must govern this case, and the ticket would not be good on another day, even if the plaintiff had no knowledge of such usage ; and to this there was no exception. The court also instructed the jury that if they found that by the established usage of the Railroad, tickets of this character were good for a return passage at the time the plaintiff attempted to return, the conductor had no right to put him off the cars, and for doing it the plaintiff might maintain an action in this form against the corporation. The defendant objected that trespass for an assault and battery would not lie against a corporation aggregate, as this was admitted to be, but otherwise did not except to these instructions. The court instructed the jury that if the plaintiff's ticket was good for a passage on the train he took the 25th, the conductor could not rightfully put him off the cars, and the plaintiff would be entitled to recover damages such as were the direct and immediate consequences of the act, such as detention, loss of time, expenses caused by the detention reasonably incurred, and for mental suffering caused by circumstances of indignity and insult, if any such were offered. The court also instructed the jury that in proper cases, exemplary damages might be awarded, and gave them instructions as to the general nature of exemplary damages, to which no exceptions were taken.

They were also instructed that if the plaintiff offered a ticket that was good and sufficient for his passage, and the officers of the road rejected it, and put him off the cars upon the ground, erroneously assumed that the ticket was not good, and that error was caused by the gross carelessness of such officers, or by the gross negligence of the Superintendent in not giving to the conductors the proper instructions, they would be authorized to award exemplary damages. But if the error was made in good faith, but was not attributable to gross carelessness, but the plaintiff was removed from the cars from motives of duty, it would not be a case for exemplary damages.

To these instructions the defendant excepted, because there was no evidence, as it alleged, to prove gross negligence, either in the conductor or Superintendent. The defendant excepted also, that the verdict on the third and seventh replications was against the evidence. The defendant also excepts that the verdict on the first, second and fourth replications does not find the issues.

The defendant requested the court to instruct the jury that the plaintiff could have acquired no right to ride on the road by virtue of any verbal license, which the court declined to do.

Copies of the declaration, pleas, replications, and rejoinders make part of the case. The jury returned a verdict for the plaintiff on all the issues, and assessed the actual damages, at $435, and the exemplary damages at $1250, in all $1635, and the defendant moves to set aside the verdict, because the damages are excessive.

The questions of law arising on this case were reserved.

## COPY OF DECLARATION.

\*       \*       \*       \*       \*       \*       \*

" In a plea of trespass, for that the defendants at Melsose, in the state of Massachusetts, on the twenty-fifth day of June, A. D. 1867, with force and arms assaulted the plaintiff, and then and there seized and laid hold of the plaintiff, and with great force and violence pulled, thrusted and dragged the plaintiff unlawfully, and without right, through the defendant's car, then and there filled with divers people and strangers to the plaintiff; and did then and there, in the presence of many people, willfully and unlawfully, and without right, with great force expel and eject the plaintiff from the defendant's cars in which the plaintiff was then and there riding, and had a right to be. Whereby the plaintiff was then and there greatly bruised, and also injured in his good name and credit, and subjected to the insults of many people, and did suffer great mortification and embarrassment of mind and feelings, and was delayed in his business and subjected to great censure by people having business at his office in Exeter, and was otherwise greatly injured and damaged.

Also in a plea of trespass, for that the defendant on the day and year aforesaid, at said Melrose, did make an assault by their servants, upon the plaintiff, and did then and there beat, bruise and ill treat the plaintiff in presence of divers persons, against the peace.

Also, in a plea of trespass, for that the plaintiff on the twenty-fourth day of June, 1867, was lawfully riding in the defendant's railroad cars from Boston to Exeter, aforesaid, and while so riding, the defendant, at a place called Melrose, with force and arms, did willfully, unjustly and without right eject, expel and thrust the plaintiff out of said cars in the presence of divers persons then and there being, and did then and there leave the plaintiff.

By reason of the premises, the plaintiff was prevented from seasonably returning to his place of business in said Exeter, and subjected to great censure, and was also greatly mortified, embarrassed and injured in his feelings, and subjected to the disdain and contempt of the people then and there being, against the peace.

To the damage of said plaintiff (as he says,) in the sum of five thousand dollars."

## COPY OF PLEAS.

\*       \*       \*       \*       " And the said Boston and Maine Railroad comes and defends, &c., when, &c., and says that the said railroad is not guilty of the said supposed trespasses in the plaintiff's declaration mentioned, in manner and form, as the plaintiff has above thereof complained against it, and of this the said railroad puts itself upon the country.

And the plaintiff doth the like.

And for a further plea in this behalf, as to the assaulting, beating, bruising and ill treating the plaintiff, and the seizing and laying hold of him, and pulling and dragging him through the defendant's car, and the expelling, thrusting and ejecting him from the said cars, as

in the plaintiff's said declaration mentioned; the said railroad by leave of court for that purpose, first had and obtained, says that the plaintiff his aforesaid action thereof against it ought not to have or maintain, because it says that the said railroad on the twenty-fifth day of June, A. D. 1867, and long before, was, and ever has been the lawful owner of a certain railroad, and of certain cars lawfully and rightfully used by it for the conveyance of passengers for hire between said Boston and said Exeter, and divers other places on the line of its railroad; and the said Belknap on the said twenty-fifth day of June, entered into said cars at said Boston, as they were about to start for said Exeter and other places, and remained therein until they started, and continued riding therein while said cars were running towards said Exeter and other places for the conveyance of passengers as aforesaid without having procured the usual ticket required of passengers for their fare, and without having paid any fare for his conveyance in said cars from said Boston to any place. And while the said Belknap was so riding in said cars, as aforesaid, the said railroad requested him to pay the reasonable and usual fare for being conveyed in said cars from said Boston to said Exeter, where he expressed his desire to go, which was one dollar and fifty cents, to which the said railroad was lawfully entitled; but the said Belknap absolulely refused to pay the same, or any fare or compensation for being conveyed in said cars from said Boston to said Exeter; and upon his said refusal to pay any fare, the said railroad informed him that he must either pay his fare or leave the cars. But the said Belknap persisted in his refusal to pay any fare or compensation for being conveyed in said cars, and insisted upon riding in said cars to said Exeter without paying anything therefor. And thereupon the said railroad then and there requested him, the said Belknap, to leave the said cars, and to go and depart from and out of the same, which the said Belknap then and there absolutely refused to do, but unlawfully remained, and continued riding in said cars without the leave or license, and against the will of said railroad, and without any right so to do; and thereupon the said railroad gently laid its hands upon the said Belknap in order to remove him from said cars, and did then gently lead him through said cars, and remove him there from at said Melrose, as it had a lawful right to do for the cause aforesaid, which are the said supposed trespasses in the introductory part of this plea mentioned, and whereof the plaintiff has complained against the said railroad, without this, that the said railroad was guilty of the said supposed trespass, or any or either of them, elsewhere than in said cars as aforesaid. And this the said railroad is ready to verify.

Wherefore it prays judgment, if the plaintiff his aforesaid action thereof against it ought to have or maintain, and for its costs.

## REPLICATIONS.

1.    *    *    *    " The said plaintiff saith as a replication in answer to the defendant's second plea, that he paid his fare to

the defendant from said Boston to said Exeter at the time he was riding in said cars, as set forth in his declaration, and of this he puts himself on the country.

2. And for a further replication to said plea, the defendant saith that, before entering said cars at said 'time, he purchased a ticket of the defendant from said Boston to said Exeter, to be crrried on said 25th day of said June from said Boston, which ticket the said Belknap then had, and of this he puts himself on the country.

3. And for a further replication to said plea, the plaintiff says that before entering said cars at said Boston, on said 25th day of said June, he paid the defendant the sum of one dollar and fifty cents to carry him from said Exeter to said Boston, and carry him from said Boston to said Exeter on said 25th day of June, in said train and that he was in said train in pursuance thereof.

And of this he puts himself on the country.

4. And for a further replication, the plaintiff says he did not refuse to pay his fare from said Boston to said Exeter.

And of this he puts himself on the country.

5. And for a further replication in this behalf the plaintiff saith that at the time he was ejected from said car as in said declaration mentioned, he was rightfully riding in said car from said Boston to said Exeter by the leave and license of the defendant, and was rightfully in said car, and had the right to remain therein until the same reached said Exeter.   And this he is ready to verify.

Wherefore he prays judgment for his damages and costs.

6. (Stricken out by order of court.)

7. And the plaintiff further saith as a replication to said plea, that the defendant did not at said time, gently lay its hands upon the plaintiff, and gently lead him through the cars as in said plea alleged, but did roughly and violently seize and remove said plaintiff from said car, using unnecessary force therein.   And of this he puts himself on the country.

## REJOINDERS.

\*        \*        \*        " And as to first, second, third, fourth, and seventh replications of the plaintiff, wherein he puts himself on the country, the defendant doth the like.

As to the fifth replication of the plaintiff, the defendant says that the plaintiff ought not to have and maintain his aforesaid action against the said defennant' because it says the plaintiff, at time of his removal from said cars, as in said declaration mentioned, was not rightfully riding in said cars from Boston to Exeter, by the leave and license of said defendant, and was not rightfully in said cars, and the right to remain therein until the same reached said Fxeter, as in said replication alleged, and of this, said defendant puts itself upon the country.

*Hatch & Wood,* for plaintiff.

Trespass can be maintained.    1 Chitty Plea. 76; *Hawkins* v. *Duchess and Steamboat Co.*, 2 Wendall 452; *McCready* v. *Guard. of Poor*, Sergt. R. 94; *Lyman* v. *White River Bridge Co.*, 2 Aik. 255, 2 Hill 573; *Goodhue* v. *City of Cincinnati*, 4 How. 500; *Hamilton* v. *City of Cincinnati*, Wright, 603; *Kneas* v. *Scuylkill Bank*, Wash. C. C. 103; *Beach* v. *Fulton Bank*, 7 Cowan 487; *Nicholson* v. *N. Y. & New Haven Railway*, 22 Conn. 74.   Corporations are liable in the same way and to the same extent as individuals, and trespass will lie.   *Hopkins* v. *Atlantic and St. Lawrence Railway*, 36 N. H. 17, and cases cited.

If a railroad servant, whose duty it is to arrest any person who has not paid his fare, apprehends a person who turns out to have paid it, the company is liable in trespass for the injury.    *Gough* v. *The Great Northern Railway Co.*, Q. B. 13 February, 1861; 30 L. J. 148.   If a conductor in an omnibus remove a person drunk, using more force than necessary, the company is liable in trespass. 30 L. J. Exch. 89; affirmed January 18, 1863.   Such is the doctrine laid down in Smith's Leading Cases.   The jury found that the conductor used unnecessary force.   The evidence on that point is conflicting, and the question was partiularly within the province of the jury.   It appears by Hamilton's testimony, that force was unnecessary, while Chapman and Harvey both testify that Hamilton pulled the plaintiff out of his seat, and led him through the cars, making a great commotion in the way he did it.   By Pettengill's testimony, it appears that force was used in ejecting the plaintiff from the cars.   In this conflicting testimony, the jury were the rightful judges, and were justified in finding the issue for the plaintiff on the sixth replication.

Exemplary damages may be recovered in this action, if gross negligence is shown.   *Whipple* v. *Walpole*, 10 N. H. 132; *Hopkins* v. *Atlantic and St. Lawrence Railway*, 36 N. H. 16.   The question of negligence is to be determined by the jury.   *Bigelow* v. *Rutland*, 4 Cush. 247; *Moshier* v. *The Utica & Schnectady Railroad*, 8 Barb. Supreme Court 427.   In actions of trespass, the measure of damages is the value of the property destroyed, unless the trespass is wanton, and that is a question for the jury entirely.   They are to determine the character of the trespass.   *Wylie* v. *Smithenan*, 8 Ird. 236.   What is ordinary care is a question of fact for the jury.   *Littlefied* v. *Biddeford*, 29 Maine 310; *Hall* v. *The City of Lowell*, 10 Cush. 260.   To determine the character of the negligence, whether of a gross nature or not, was the particular province of the jury.   The court says in *Wylie* v. *Smilhenan*, " in actions of trespass the value of the property destroyed, is the measure of damages, unless the trespass is wanton and malicious, which is a question entirely for the jury."   Where there is no motion in the court below to set aside a verdict as against evidence, the court will not hear it here. *Rockingham Bank* v. *Claggett*, 29 N. H. 292.   The verdict is not to be disturbed merely because the court, on the evidence, would have decided differently.   The jury is the lawful and proper tribu-

nal to determine questions of fact. It must be apparent that the jury have not acted with intelligence and honesty to justify the court in disturbing the verdict. *Clark* v. *Society*, 45 N. H. 334; *Wendell* v. *Safford*, 12 N. H. 178. The court must be fully satisfied that the verdict was procured by corruption or by manifest mistake. *Lisbon* v. *Batchelder*, 21 N. H. 320; *Gould* v. *White*, 26 N. H. 178. The court, without objection, were allowed to give general instructions as to the nature of exemplary damage, and to submit the whole question to the jury. After the jury returned their verdict it was too late to take the exception that there was no evidence to prove gross negligence. A difference between the court and the jury in regard to the conclusion drawn from the evidence is no reason for disturbing the verdict. *Milo* v. *Guardian*, 4 Maine 549. The province of the court is limited to the competency of testimony, to draw inferences and determine its weight, is the province of the jury. *Wendell* v. *Moulton*, 26 N. H. 41. The court will not set aside a verdict, merely because they should have arrived at a different result. *Gould* v. *White*, 26 N. H. 188. Excessive damages are good cause for setting aside a *verdict when the court may presume that the jury were influenced by passion, partiality, or corruption.* *Rand* v. *Reddington*, 13 N. H. 76; *Tillotson* v. *Chadbourne*, 2 Johnson 74; *Coffin* v. *Coffin*, 4 Mass. 41; *Clark* v. *Binney*, 2 Pick. 113; *Coleman* v. *Southwick*, 9 Johnson 45. In *Duberly* v. *Gurney*, 4 Term Rep. 655, where the jury gave £5,000, Lord Kenyon said he should have been satisfied if nominal damages had been given, yet he knew of no case that would authorize the court to interfere, and he said he had not the courage to make the first precedent. In *Southwick* v. *Stephens*, 10 Johnson 143, the court specially instructed the jury that in their opinion they ought to find trifling damages, and the jury found $650. On motion to set aside the verdict, the court say it was for the jury to determine how far the ridicule of the plaintiff was malevolent and calculated to injure his feelings, and prejudice him in the eyes of the people, and they refused the motion. In *Taunton Manufacturing Company* v. *Smith*, 9 Pick., the court say this discretion is to be exercised very cautiously and perhaps never for this cause alone, where the action is of a vindictive nature and the damages properly arbitrary with the jury.

*Stickney* and *Small*, for defendant.

1. The ticket, which the plaintiff had, by its terms upon its face, was good only on June 24th, and the ruling of the court upon that point, was erroneous.

2. The plaintiff was improperly permitted to prove the character and duration of the celebration, and that it continued until after the last train from Boston to Exeter, on June 24.

3. Trespass for an assault and battery does not lie against a corporation aggregate, as this was admitted to be.

It is laid down in 1 Bl. 476, that a corporation aggregate cannot

be made a defendant in an action for assault and battery, or such like personal action. In a note the case of *Childs* v. *Bank*, 17 Miss. 213, is cited. The same doctrine is held 1 Kyd 223.

4. There was no evidence of gross negligence or carelessness on the part of the conductor or superintendent, and the instructions of the court on that point in reference to exemplary damages, were erroneous.

5. The verdict on the third and seventh replications was against the evidence and should be set aside.

6. The verdict on the first, second and fourth replications does not find the issues.

7 The court should have instructed the jury as requested by the defendant that the plaintiff could acquire no right to ride on the road by virtue of a verbal license.

8. The damages found by the jury were excessive and the verdict should be set aside for that reason.

The actual damage, $435, was excessive. The plaintiff received no injury; he was treated as gently as he could be, and received no ungentlemanly language; he was requested repeatedly to go out, but he refused, which made it necessary for the conductor to take hold of him and remove him. If he had gone out, when requested, it would have attracted no attention and but few people would have known it. The commotion which he speaks of and the looking out of the cars by the passengers, were caused by his own act, and he should not have exorbitant damages on that account. The detention, loss of time and expense caused by the removal, were trifling, and the mental suffering could not have been much, as no indignity or insult was offered and nothing of an aggravating nature took place. We cannot imagine upon what ground the jury could have found the actual damage to have been $435. There was no reason or principle in it, but only prejudice. The exemplary damages, $1,250, were still more unreasonable and excessive. We claim, that there was no cause for any exemplary damages. There was no malice, no cruelty, no violence, no fraud, nothing of a criminal or immoral character, and no gross negligence or carelessness. There can be no question that the conductor acted in good faith and did what he believed to be his duty. Upon what ground then could the jury give exemplary damages? If they could find exemplary damages in this case, they can in every case, where a party does an act which he had no right to do, although he did the act with the full belief that he had a right to do it. According to the reasoning and principles laid down by the court, in *Hopkins* v. *Atl. & St. L. Railroad*, no exemplary damages should have been given in this case.

In *Aiken* v. *Wilson*, 4 Cush. 273, the court doubt the propriety of giving exemplary or punitive damages in civil cases. Such damages should not be given wantonly or recklessly, but should be governed by some principle and reason, and should be proportioned to the offence. It appears to us unreasonable and unjust that the defendant should be punished so severely for the acts of its officers,

when the most that can be said against them is, that they made a mistake as to their rights and powers.

SARGENT, J.   The rule for exemplary damages is, that they are not to be given except in cases of fraud, malice, gross negligence or oppression; that where neither of these is found, the damages are to be confined to compensation for the injury.   But when either of these elements mingles in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule, and permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, blends together the interests of society and of the aggrieved individual, and gives damages, not only to recompense the sufferer, but to punish the offender.   Sedgw. on Damages, *38, and cases.

It is not easy to see from the evidence as reported in this case, what ground for exemplary damages there was; but, perhaps, it may and should be assumed that there was some evidence, supposed to bear upon this question by the court, as it seems that the court gave full instructions upon the subject, though the objection was made that there was no evidence on which they could properly be based; and it is claimed that even under the instructions of the court, and upon the facts stated, the damages are so excessive that the verdict ought to be set aside for that cause alone.

It is suggested in *Hill* v. *New Haven*, 27 Vt. 501, 512, that where the motion is to set aside a verdict as being contrary to or unsupported by the evidence in the case, the consideration of that motion should be by the court at the trial term, where the cause was heard, and Poland, C. J., says: "In our judgment, the power to grant new trials for this cause should be confined to the court before which the case is tried, who saw the witnesses and heard them testify, and should not be entrusted at all to another tribunal, who have only a meager outline of the case afforded by the judge's notes of the evidence taken at the trial."   It is no doubt within the discretion of the judge at the trial term to set aside the verdict, if it is entirely unsupported by the evidence; or he may refuse to do so upon motion, and in either case we should not reverse his decision, unless he expressly reserved that question of discretion.

But where the claim is that the verdict is in favor of the right party, but is excessive in amount, there might be more reason why the judge at the trial term might desire to consult with the other members of the court and obtain their views of the subject.   It is more a question of judgment, and we think may often be properly reserved for the consideration of the whole court.   The motion in this case was properly made at the trial term to set aside the verdict on the ground that the damages were excessive, and that question has been specially reserved for the consideration of the whole court by the judge who tried the cause.

Sedgwick, in his work on damages (5th Ed.), p. 707, says: "The court again holds itself at liberty to set aside verdicts and grant

new trials, in that class of cases, where there is no fixed legal rule of compensation, whenever the damages are so excessive as to create the belief that the jury have been misled either by passion, prejudice, or ignorance ;" and numerous authorities are cited which sustain that position.

In Massachusetts, that has long been settled to be the law. In *Coffin* v. *Coffin*, 4 Mass. 1, in an action of slander, the court refused to set aside the verdict of $2500, saying : " Before we can set aside this verdict, on account of these damages, we must infer from their magnitude that the jury acted intemperately, or were influenced by passion, prejudice, or partiality." The same doctrine was announced in a similar case, in *Clark* v. *Binney*, 2 Pick. 121. And where a sheriff's jury had assessed land damages caused by the location of a turnpike at a greater rate than $900 per acre, and the court of sessions rejected that verdict because the damages were excessive, the supreme court refused to issue a mandamus to the sessions to allow and record the verdict. *Com.* v. *Norfolk*, 5 Mass. 435.

In *Lincoln* v. *Hapgood*, 11 Mass. 350, it was alleged that the damages were inadequate, but the verdict was not set aside, though the general question is considered. And in actions of slander, it is said that the court must be satisfied that the rule of fair compensation has been departed from ; that passion, not reason, has decided it ; that some undue influence has swayed the minds of the jury. *Shute* v. *Barrett*, 7 Pick. 82.

A new trial will be granted where the damages are too small as well as when they are excessive. *Taunton Manfg. Co.* v. *Smith*, 9 Pick. 11.

To justify the interference of the court, the damages must be manifestly exorbitant ; and so excessive as to warrant the belief that the jury must have been influenced by partiality or prejudice, or have been misled by some mistaken views of the merits of the case. *Worster* v. *Canal Bridge*, 16 Pick. 541 ; *Treanor* v. *Donohoe*, 9 Cush. 228 ; *Shaw* v. *Boston & Worcester R. R.*, 8 Gray 45.

So in New York, the question has been pretty fully considered. *McConnell* v. *Hampton*, 12 Johns. 234, was an action for assault and battery and false imprisonment, with a verdict for plaintiff for $9000 damages. The defendant being a man of education and worth $60,000, was in command of the U. S. army at Burlington. Plaintiff came to him to make some communication concerning the enemy, when defendant had him arrested and confined in the guard-house from Tuesday till Sunday. Upon a motion for a new trial, on the ground that the damages were excessive, Thompson, C. J., said : " To refuse a new trial in this case would, in effect, be saying that a new trial ought never to be granted in actions of this description. Although the defendant is a man of very large fortune, the plaintiff's injury is not thereby enhanced. Under all the circumstances, I am inclined to think it will be a discreet exercise of the power of granting new trials to send this cause back for the consideration of another jury."

And in *Coleman* v. *Southwick*, 9 Johns. 45 ; and in *Southwick* v. *Stevens*, 10 Johns. 443 ; and in *Sargent* v. ——, 5 Cow. 106, 119,— it is held that to warrant the court in interfering, the damages must be so very excessive as to warrant an inference of prejudice, partiality, passion, or corruption in the jury ; while in *Collins* v. *Albany & S. R. R. Co.*, 12 Barb. 492, it is said that the right of the court thus to interfere, when the damages found by the jury are clearly excessive, though it has always been cautiously exercised, has never been denied. Such a right is absolutely necessary to the safe administration of justice, and ought, in all proper cases, to be asserted and exercised. That when the damages found by the jury are either so large or so small as to force upon the mind of any man familiar with the circumstances of the case, the conviction that, by some means, the jury have acted under the influence of a perverted judgment, it is the duty of the court in the exercise of a sound discretion to grant a new trial.

In *Clapp* v. *Hudson River R. R. Co.*, 19 Barb. 461, the same doctrines are reiterated ; and, in both these cases, the verdicts were set aside as excessive. In the last case, the court say : " More injustice has been done by refusing to interfere with verdicts which were confessedly extravagant, than by any indiscreet exercise of the power on the part of the court. See, also, *Murrey* v. *Hudson R. R. Co.*, 47 Barb. 196, and cases cited.

It is said in *Travis* v. *Barger*, 24 Barb. 614, that in cases of *criminal connection* and seduction, the court have never exercised this power ; although it is conceded that they possess it. To the same effect is Sedgw. on Dam. 709.

The same general principles are followed in England, and in the other states of our Union. See authorities cited in Sedgw. on Dam. 706, 7, 8 : also, cases cited in *Collins* v. *Railroad*, 12 Barb. *supra*; *Rand* v. *Redington*, 13 N. H. 76, and cases cited.

In the light of these well-established principles, let us examine the case before us. The plaintiff was in no way injured or maltreated in his person ; no bruises, wounds, contusions, or marks of any kind were left upon him ; no blows were struck ; no force applied, except such as was necessary to remove him from the cars in the easiest manner possible. This caused no pain or bodily suffering whatever at the time or afterwards.

He was not insulted by the use of profane, vulgar, or ungentlemanly language, but, on the contrary, the plaintiff testifies that the conductor used no ungentlemanly language, and was as gentle as he could be. Plaintiff's clothing was not injured in any way, nor was any property of his lost, destroyed or in any way damaged by his being removed from the cars.

After considerable discussion with the conductor, the plaintiff was notified that he must either pay his fare or leave the cars, both of which he refused to do, knowing that the result must be, that he would be removed ; and the plaintiff himself does not pretend in his testimony that any more force was used than just what was necessary

to remove him in the easiest manner possible. It is said that the public attention was called to the matter, and that there were circumstances of indignity and unfavorable notoriety, and disgrace, attending such a removal, which are matters of great aggravation. But these were nothing more than must be attendant upon any similar case, and nothing more than the plaintiff knew beforehand, must necessarily attend and accompany such an act, and all which he chose to meet and face, and to risk, rather than pay some dollar and a half for fare to Exeter. If he had offered to pay his fare and the company had refused it, then he would have had no alternative but to leave voluntarily or be removed. He could have paid his fare under protest, and have sued the company for the breach of their contract to carry him to Exeter upon his ticket, and have tried the question of right in that way just as well; or he could have left the car without force or compulsion, after his notice to leave, without damaging his rights in the least. He could in either of these ways have avoided all the notoriety and publicity of which he now complains, without sacrificing his rights in the least. But he evidently sought to be made as much of a martyr as possible.

The real damage to the plaintiff was the loss of three hours' time. He started to go home at twelve o'clock, noon; was put off the cars at Melrose, some seven or eight miles from Boston; returned to Boston, the fare being about twenty cents, and left for home on the three o'clock P. M. train. Whether he procured a dinner or lunch, or neither, does not appear. He should have reached home at two o'clock, but did not arrive until five P. M. He does not offer to prove any special damage, such as loss of business, or the opportunity to make good bargains, or anything of that kind. On the score of compensation, then, he is entitled to pay for three hours' time and his necessary expenses; and for that, the road has confessed judgment for $5, probably a fair equivalent for the time and expense. All the other wrongs and indignities he could have avoided by the payment of his fare to Exeter, and have saved his three hours' time and expenses besides, and not have waived or affected his right against the road, to have sued them for damages.

What, then, ought this plaintiff to recover as compensation for all his injury proved in this case? We must remember that in considering this question of actual damage, of compensation for actual injury, it is immaterial what may be the character, standing, condition or means of the defendant. The rule of damages is compensation for the plaintiff's injury; that is all, and that would be the same, whether the defendant be a railroad or a private individual; or whether that private individual were rich or poor. The question is not how much the defendant is able to pay, but what is a fair compensation to this plaintiff for all the injury he has suffered? That injury is the same, whether the defendant is the richest railroad or the poorest individual in the community. What is the plaintiff's *injury* for which he is to receive compensation in damages? And what *amount* in damages will *compensate* him for *that injury?* These

are the only questions to be settled, so far as determining the *actual* damage which the plaintiff is entitled to recover. If this defendant had been a private individual, no doubt most juries would have held that under the circumstances of this case, enough had been confessed in the suit, to meet all the defendant's actual injury; but if some juror should stick for a higher verdict than that, we think it would trouble him to give any valid reason for going as high as $25.

In regard to the question of exemplary damages, though upon the evidence, there is great doubt whether there should have been any allowed at all, yet if any were to be allowed the rule for assessing it would be very different from the one we have been considering. In that case the jury undertake, first to give the plaintiff damages, as a compensation for his injury, and second they undertake also to punish the offender for the wrong he has done, and when that element is introduced it becomes proper to inquire into the condition and circumstances of the defendant, because what would be a severe punishment for a poor man by way of fine or exemplary damages, might not be felt by one that was rich. What would be sufficient as damages, by way of example and of punishment, for a day laborer, would be nothing by way either of example or as a punishment for this defendant, as a corporation. Not only the ability of defendant, but the motives and intentions accompanying the act, the malice or oppression exhibited, the wrong and injustice of the act, may be inquired into, with a view to fix the proper measure of punitory or exemplary damages.

That the actual damages which plaintiff suffered; that his injury for which he is to receive compensation, was anything in amount like the sum found by the jury, viz: $435.00 seems simply absurd. We think it evident that the jury were affected by some partiality or prejudice from some cause, and that their verdict ought for that reason to be set aside.

In assessing the exemplary damages, they had a right to adopt a different rule from that applied in assessing the actual damages, yet it is fair to presume that in assessing the exemplary damages, they were affected by the same improper influences, and in the same proportion as in case of the actual damages.

The question is, whether the verdict must be wholly set aside, or, whether it can be reduced to what is reasonable and the plaintiff allowed to take judgment for that amount. We find the latter course has oftener been adopted in practice, than the former. In Sedgw. on Dam. (5 Ed.) 709, it is said "where the jury have given such excessive damages, that the court feel bound to set aside the verdict, they will, instead of simply ordering a new trial, give the plaintiff the option of reducing the verdict to the sum which the court considers reasonable, and on his remitting the excess, will deny the motion for a new trial, and this in actions for tort, as well as upon contracts."

This has been a very common practice in this country and in England. It was so in *Armytage* v. *Haley*, 4 Adol & Ellis N. R. (4, Q. B.) 917, where one farthing damages was given; the court

ordered a new trial, unless the defendant would consent to increase the damages so as to cover the surgeon's bill.

In *Diblin* v. *Murphy*, 3 Sandf. (N. Y.) 19, the court ordered the verdict set aside, unless the plaintiff, within ten days, would stipulate to reduce the verdict from $1,500 to $600.

A similar order was made in *Blunt* v. *Little*, 3 Mason 102, by Judge Story. The verdict of $2,000, was to be set aside unless the plaintiff remit $500 of his damages.

In *Collins* v. *Albany & S. R. R. Co.*, 12 Barb. *supra*, the verdict for $11,000, was ordered to be set aside, unless plaintiff should reduce it to $5,000, in twenty days.

To the same effect are *Lambert* v. *Craig*, 12 Pick. 197 ; *Doyle* v. *Dixon*, 97 Mass. 208, and cases cited.

In Texas the power of reducing the verdict by the court, has been limited to those cases where the measure of damages is matter of law, upon the ground that in other cases, the court has no right to substitute its opinion for that of the jury. *Thomas* v. *Womack*, 13 Texas 580.

While in Louisiana it is held that the court have power to reduce the verdict, to what is reasonable, and to render judgment absolutely and unconditionally for the reduced amount. *Black* v. *Carrolton R. R. Co.*, 10 Lou. Ann. 33.

In this case our judgment differs so very materially from the finding of the jury, as to the proper amount of damages, that we might hesitate to fix the amount of damages, to which we think the plaintiff entitled. But we are not compelled to rely upon our own judgment alone, for this case has once before been tried by a jury, upon a declaration which was defective to be sure, and for that reason, judgment was arrested. But the declaration contained one count in tort, and the court instructed the jury, that they might give exemplary damages, if the evidence in their judgment warranted it. Thus the whole question was submitted to the jury, and their verdict taken, which verdict, we think, may be a proper guide for us, in this case. That verdict was rendered in 1868, when the jury were, perhaps, much less likely to be prejudiced, and much more likely to be impartial, than at the present time, if any attempt has been made by those interested, to affect the public sentiment on that subject. For there are other cases pending, upon the docket of this county against this defendant, growing out of this same transaction, the plaintiffs in which have been important witnesses in this case.

That first verdict was for the sum of $200, and though that amount might seem large, we think it safer to adopt that verdict as the true rule of damages, than to make any estimate of our own.

If, therefore, the plaintiff elects to reduce the verdict to $200, judgment may be rendered thereon, for that amount, with full costs of suit. Plaintiff to make his election and notify clerk on or before the — day of —— next.

To the other questions in the case we have given no attention. We see no objection to the rulings made at the trial.