Hillsborough
No. 86-202

LOUKIA PANAS AND NICHOLAS PANAS

v.

JOHN HARAKIS AND K-MART CORPORATION

August 6, 1987

592

594

*Law Offices of Edward W. Richards*, of Nashua (*Edward W. Richards* and *Janine Gawryl* on the brief, and *Mr. Richards* orally), for the plaintiffs.

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Arthur G. Greene* and *Jane E. Cetlin* on the brief, and *Mr. Greene* orally), for the defendants.

THAYER, J. In this case, both the plaintiffs and the defendants appeal various findings and rulings of the Superior Court (*Pappagianis* and *Dalianis*, JJ.) made during the course of the plaintiffs' suit for false imprisonment; malicious prosecution; slander; invasion of privacy; negligent hiring, training, supervision, and failure to terminate; negligent performance of duties; and loss of consortium for the above causes of action. The plaintiffs assign error to the court's (1) setting aside of the jury verdict as "manifestly exorbitant" and ordering a new trial on damages only;

(2) refusal to admit into evidence the defendant John Harakis' criminal convictions; and (3) alleged refusal to give jury instructions on additional compensatory damages. The defendants, in turn, assign error to the court's (1) admission into evidence of the facts and circumstances underlying the defendant Harakis' criminal convictions; (2) refusal to declare a mistrial after plaintiffs' counsel had elicited testimony from Harakis regarding his criminal record; (3) failure to instruct the jury that the merchant's privilege statute, RSA 627:8-a, was a complete defense to all of the plaintiffs' counts; and (4) allowing the plaintiffs to amend their writs to add alleged counts for negligent infliction of emotional distress. We affirm.

On January 30, 1983, sometime after 1:00 p.m., Loukia and Nicholas Panas ventured into the K-Mart department store on South Willow Street in Manchester. The couple purchased Valentine's Day cards for their two boys, and a baking tin. The Panases then left the store and returned to their car, where they deposited their purchases. They crossed the mall parking lot and were about to enter Chuck E. Cheese's Pizza Time Restaurant, where their two boys were waiting for them. Before they entered the restaurant, however, John Harakis, who was employed as a K-Mart security guard, stopped the Panases and accused them of shoplifting.

At trial, Harakis testified that while the Panases were in the K-Mart store, he had seen Loukia Panas break into a package of spark plugs and place one of them in her coat pocket. Harakis stated that he followed the Panases into the parking lot, where he observed Loukia Panas take an object from her right coat pocket and put it into the front of the car. After the Panases left their car to proceed toward the restaurant, Harakis walked to the car, peered into it, and noticed spark plugs on the dashboard. After viewing the spark plugs, Harakis motioned to a K-Mart employee to act as a witness and proceeded to apprehend the couple at the restaurant entrance. Harakis claimed that he then asked Loukia Panas to return to K-Mart "to talk about the merchandise that she took from the store." The Panases testified that Harakis said, "You're under arrest," loudly accused Loukia Panas of shoplifting, and ordered her to return to the K-Mart store with her arms raised above her head. Harakis denied that Loukia Panas had returned to the store with her hands raised; and store employees corroborated his testimony, although one employee admitted he could not hear exactly what Harakis said to the Panases.

The Panases were taken into the K-Mart security office. Harakis emptied the contents of Loukia Panas' pocketbook onto a table, and searched the pockets of her coat. He then asked the Panases to sign a release form admitting that they had shoplifted in return for a promise from K-Mart not to press charges. Loukia Panas declined the offer. At approximately 4:20 p.m., Officer Jeffrey Czarnec, of the Manchester Police Department, arrived at K-Mart in response to a shoplifting call. Harakis informed Czarnec of his apprehension of Panas. Panas offered to take Harakis and Czarnec to her car in order to show them the items she had purchased. Czarnec and Harakis saw the spark plugs in the car. Panas gave them to Harakis who handed them to Czarnec. Panas told Czarnec they had been there for several days. Nicholas Panas testified that he had purchased the spark plugs approximately a month before at a Bradlee's department store in Chelmsford, Massachusetts. Czarnec testified that Loukia Panas volunteered to pay K-Mart for the spark plugs. At trial, Panas denied she had ever offered to pay for the spark plugs.

Based on information he received from Harakis, and that Loukia Panas had allegedly offered to pay for the spark plugs, Officer Czarnec placed Loukia Panas under arrest. She was handcuffed and placed in the rear of a paddy wagon while her children watched. Once at the police station, she was fingerprinted and photographed, her coat was removed, and she was placed in a jail cell. While in the cell, she vomited. Panas stayed in the jail cell for several hours until her husband could go home and obtain bail money. A trial date for the shoplifting of the spark plugs was set for April 8, 1983. Harakis was subpoenaed to appear as a witness, but did not do so. No other K-Mart representative appeared, and the case was dismissed for lack of prosecution.

Loukia Panas brought suit against John Harakis and K-Mart for false imprisonment; malicious prosecution; invasion of privacy; slander; negligent hiring, training, supervision, and failure to terminate John Harakis; negligent infliction of emotional distress and intentional infliction of emotional distress. Nicholas Panas brought suit for loss of consortium under the above theories. The defendants filed a motion to dismiss the counts of negligent and intentional infliction of emotional distress, alleging that no such causes of action are recognized in New Hampshire. The Superior Court (*Dalianis*, J.) granted the motion. The plaintiffs then filed a motion to amend the writ by adding counts against K-Mart and Harakis alleging negligent performance of Harakis' duties that caused, *inter alia*, mental and emotional distress to Loukia Panas.

The Superior Court (*Dalianis*, J.) granted the motion to amend. The defendants then argued a motion to dismiss those counts on the basis that they were restatements of the negligent infliction of emotional distress counts. The Superior Court (*Pappagianis*, J.) denied the defendants' motion to dismiss the additional counts.

In February, 1986, the plaintiffs filed a motion in limine to admit criminal records of John Harakis that had been annulled. The Superior Court (*Dalianis*, J.) ruled that evidence of the annulled convictions could not be offered. The court did, however, rule that the underlying facts and circumstances giving rise to a 1980 conviction for impersonation of a police officer could be admitted into evidence, provided that such evidence could be introduced without reference to the actual criminal proceedings. The court also ruled that the underlying facts and circumstances of a 1976 conviction for attempted theft could not be admitted because any probative value was outweighed by the danger of undue prejudice.

The trial below commenced on March 24, 1986, and lasted for ten days. Loukia Panas testified that when she was apprehended by John Harakis she felt "embarrassed," "terrible," and that her legs shook. She stated that, after January 30, 1983, the date of the incident, she ceased to attend church services, or go shopping in malls or stores, and experienced difficulty in getting to sleep. She stated at one point that she had lost the ability to function as a "good mother and wife." Nicholas Panas also testified to his wife's inward withdrawal, and remarked that her weight had gone from 130 pounds at the time of the incident to 197 pounds.

The plaintiffs produced several expert psychiatric witnesses. Dr. Harold Bursztajn, a clinical professor of psychiatry at the Harvard Medical School, testified that Loukia Panas was a person from a conservative, family-oriented background whose "mission in life was basically to go ahead and teach her children to be just like their father, to be honest, law-abiding, upstanding people. She really has devoted her whole life to that, and this is something which all of a sudden went to pieces." Dr. Bursztajn proceeded to state that the event of Loukia Panas' apprehension and imprisonment caused her to suffer a post-traumatic stress disorder that manifests itself in the following respects: (1) Panas experiences recurrent and intrusive recollections of the event, (2) she has recurrent dreams of the event that awaken her, (3) whenever she attempts to describe the event she becomes frightened and overwhelmed, and (4) she has withdrawn from participating in her children's school activities, and has grown detached from her husband in terms of sexual intimacy.

Dr. Paul Menitoff, a psychiatrist in private practice in the Lowell, Massachusetts area, also testified on behalf of Loukia Panas. Dr. Menitoff stated that, after examining Panas, and talking to several of her friends, he diagnosed her as suffering from post-traumatic stress disorder with anxiety and depression. Dr. Menitoff said that the incident was the "stressor," or precipitating factor, in the psychological illnesses. Dr. Menitoff suggested that Loukia Panas' conservative, religious upbringing in a small city in Greece rendered her particularly sensitive to being arrested.

On cross-examination, Loukia Panas testified that she does cook meals, make beds, clean and do laundry. Loukia Panas' psychiatric nurse testified that her condition improved when taking prescription medication. Panas, however, discontinued the medication, and six months later her condition deteriorated. The defendants' expert psychiatric witness, Dr. George Shaka, a private practitioner, testified that he did not think Loukia Panas suffered from post-traumatic stress disorder, but rather from "a major depression." Dr. Shaka testified that several events dating from the late 1970's had caused Panas' depression. These events were: two miscarriages, two check-ups for cervical cancer in 1978 and 1980 due to a family history of cervical cancer, two bouts with inflammation of the pelvis, and a stroke suffered by her mother in 1980. Dr. Shaka also testified that, although Panas claimed the incident had caused her weight to increase from 135 to 180 pounds, her medical records revealed that she had weighed 161 pounds in 1976 and 168 pounds in 1980. He concluded by stating that Panas requires more intensive treatment, and that with such treatment he would expect her to recover.

After the trial, the jury deliberated for three days and, in response to special jury questions from the Court (*Pappagianis*, J.), returned findings for Loukia Panas against John Harakis on her counts of malicious prosecution, slander, and negligent performance of Harakis' duties as security officer. The jury also returned findings for Panas against K-Mart for negligent hiring, negligent training and instruction, negligent supervision, negligent failure to fire Harakis, and for Harakis' negligent performance of his duties as security manager. The jury returned findings for Harakis and K-Mart on Loukia Panas' counts of false imprisonment and invasion of privacy. On the false imprisonment count, the jury found that from a subjective standpoint, Harakis thought he had reasonable grounds to detain Loukia Panas, but that from the objective standpoint of a reasonable person, he did not have grounds to detain her. The jury awarded Loukia Panas $1,000,000 and Nicholas

Panas $100,000 as compensatory damages against Harakis and K-Mart. The jury declined to award liberal damages.

After the trial the defendants moved for judgment notwithstanding the verdict, which the court denied. The defendants also moved for a remittitur, or reduction in damages. The court took the motion for remittitur under advisement.

In an order dated April 15, 1986, the Trial Court (*Pappagianis*, J.) noted that no evidence had been presented of lost wages, or doctors', hospital, or medicine bills. The court then computed the cost of the psychiatric treatment undergone by Loukia Panas, by multiplying the hours of treatment by the stated hourly rate of Panas' psychiatrists. The court determined that the cost of the psychiatric care amounted to $5,160. After pointing out that the plaintiffs' attorney had argued in his opening statement that Loukia Panas had suffered serious psychological injuries, the court stated that the jury had awarded Loukia Panas $994,840 for her psychological injuries. The court then found that this award and the award of $100,000 to Nicholas Panas for loss of consortium were "manifestly exorbitant and unreasonable, and [warranted] the belief that the jury had a mistaken view of the plaintiffs' case for damages." The court set aside the damages verdict and concluded by ordering a new trial limited to the issue of damages. This appeal and cross-appeal ensued.

I. *The Trial Court's Setting Aside of Jury Verdicts on Damages*

The first issue we consider is whether the trial court abused its discretion in deciding to set aside the jury verdicts on the plaintiffs' damages. Two apparently distinct standards exist in New Hampshire on the trial court's setting aside of a jury verdict. The first standard was enunciated, albeit in embryonic form, in *Wendell v. Safford*, 12 N.H. 171 (1841). *Wendell* held that

> "Where the verdict is decidedly against the weight of the evidence, so that it is apparent that the jury must have misunderstood or totally disregarded the instructions of the court thereon, or must have neglected to consider the facts, and overlooked prominent and essential points in the evidence, where it is such a verdict that twelve honest and intelligent men would not have returned it, it is the duty of the court to set it aside."

*Id.* at 178. *Wendell* thus appeared to establish inquiry into the weight of the evidence as of paramount importance. Aspects of jury error were not so much independent grounds for setting aside a

verdict, as they were illustrative of the magnitude of the jury's unreasonable evaluation of where the evidence preponderated. Several subsequent cases, however, focused much more attention on the jury error element of the *Wendell* formulation, even to the virtual exclusion of evidentiary weight considerations. *See Lisbon v. Bath*, 21 N.H. 319, 335 (1850) ("We do not interfere with the verdict of a jury to set it aside as against evidence, unless we are well satisfied that it has been procured through corruption, or manifest mistake in the consideration and application of the evidence, and that substantial justice has not been done."); and *Gould v. White*, 26 N.H. 178, 188 (1852). This emphasis on jury error was corrected in a line of cases beginning with *Clark v. Society*, 45 N.H. 331, 334 (1864), wherein this court again emphasized the consideration of verdicts as "decidedly against the weight of the evidence." *Id.*

In *Belknap v. Railroad*, 49 N.H. 358 (1870), however, this court turned once again to an analysis based primarily on jury error, this time without even mentioning an evidentiary inquiry. *Belknap* held that "[t]o justify the interference of the court, the damages must be manifestly exorbitant; and so excessive as to warrant the belief that the jury must have been influenced by partiality or prejudice, or have been misled by some mistaken views of the merits of the case" (citations omitted). *Id.* at 371. As might be expected from the prior development of the law, the *Belknap* rule did not last long in an unaltered state. In *Lucier v. Larose*, 66 N.H. 141 (1889), the court returned to an analysis based, at least in part, on examination of the weight of the evidence: "a verdict will not be set aside unless it is so decidedly against the weight of evidence as to make it apparent that the jury must have been misled or were guilty of misconduct." *Id.* at 142. This variant of the *Belknap* standard was cited in a line of cases including *Bennett v. Larose*, 82 N.H. 443, 447, 136 A. 254, 256 (1926) (in motions to set aside the verdict as against the weight of the evidence, the applicable standard is "whether there was such a preponderance of evidence in favor of the moving party as to justify a finding of passion, prejudice, partiality, corruption or plain mistake") (citations omitted). Thus stood the status of the first standard to set aside verdicts as against the weight of the evidence, before the onset of the second standard.

In *Wisutskie v. Malouin*, 88 N.H. 242, 245–46, 186 A. 769, 771 (1936), this court performed an important gloss on the *Belknap-Bennett* standard, calling into question the previous focus on the elements of mistake, partiality, and corruption:

"It seems confusing that the idea of mistake, partiality or corruption should be made an element for the court's consideration. It is advanced, however, in a majority of cases in which the trial court's authority and duty has called for statement. These reasons, of mistake, partiality, and corruption, for setting aside a verdict are distinct from the ground that the verdict is against the weight of the evidence. It may be said that if the verdict is not supported by the weight of the evidence, a mistake has been made. But that is no more than saying that error exists. If the evidence contrary to the verdict is so weighty that the verdict should be vacated, that is the reason for vacating it. Why the evidence was not properly treated, may be a collateral inquiry, but it is not the immediate one. Whether it was, is. The mistake may be explanatory or descriptive of the erroneous verdict, but it is not directly probative of it. The inquiry is of relation between the evidence and the verdict. Except in cases where mistake is alleged as the ground of the motion, it is arguing backwards to say that mistake shows the error. Mistake vitiates a verdict, and so also does a contrary weight of evidence. Each is a separate ground. Where the weight of evidence lies is not shown by reasons disregarding it. To introduce the subject of mistake, or partiality or corruption, in helping to show the conflict between the evidence and the verdict is to cloud the issue."

We believe the *Wisutskie* court was eminently correct in shifting the analysis to the evidentiary weight issue, and away from the "collateral" matters of mistake, partiality, and corruption. As *Wisutskie* states, the arrival at a verdict conclusively against the weight of the evidence necessarily entails the commission of a mistake on the part of the jury. To speak in terms of mistake, partiality or corruption thus begs the prior dispositive question of the verdict's relationship to the evidence at hand.

The *Wisutskie* opinion culminated its otherwise well-reasoned theoretical discussion with an ambiguous conclusion. The opinion appears to state the relevant standard as follows:

"In *Lawrence v. Towle*, 59 N.H. 28, 30, the court announced the rule thus: 'A verdict will not be set aside as being against the weight of evidence, unless the preponderance was so great as to make it apparent that the *jury were misled*, or *failed to consider intelligently the*

*evidence laid before them.'* With the qualification that it must appear clearly and definitely that the jury did not act properly in its consideration of the evidence, this statement is regarded as accurately marking out the trial court's duty in passing upon the issue."

*Wisutskie,* 88 N.H. at 246, 186 A. at 771 (emphasis added). The question raised by this quotation lies in the mention of a jury "misled" or not considering "intelligently the evidence laid before them." This language appears to reinstate mistake and jury error as a proper line of inquiry, despite the opinion's earlier decisive rejection of such an analysis. Two paragraphs later, however, the court enunciates a standard far more consistent with its prior discussion:

"From the foregoing discussion it follows that the two questions to be answered in the case here are (1) whether the evidence for the [party against whom the jury decides] is conclusive in his favor, and (2) *whether the verdict was conclusively against the weight of the evidence.* If the second question is answered in the negative, the first one must be answered in like manner. If, in respect to the second question, the trial court's finding was a reasonable one, it may not be disturbed."

*Wisutskie,* 88 N.H. at 246, 186 A. at 771 (emphasis added).

Considering the court's thorough invalidation of jury mistake as a legitimate line of inquiry, we believe the quote from *Lawrence* represented an effort to support *Wisutskie's* analysis with authority that unfortunately did not state quite what the court wished. When the *Wisutskie* court spoke directly on the issue, however, such as in the quotation immediately above, it spoke unambiguously and restricted itself to consideration only of the weight of the evidence. Therefore, the final conclusion we draw is that *Wisutskie* intended that the test for a trial court's setting aside of a verdict be "whether the verdict was conclusively against the weight of the evidence."

Unfortunately, over the ensuing years, this court appeared to stray from the standard enunciated in *Wisutskie.* Consequently, issues involving the setting aside of jury verdicts as against the weight of the evidence were decided at various times under both the questionable *Belknap-Bennett* standard of mistake, partiality or prejudice, *see, e.g., Bothwick v. LaBelle,* 115 N.H. 279, 280, 339 A.2d 29, 31 (1975); *State v. Charpentier,* 126 N.H. 56, 63, 489 A.2d 594, 599–600 (1985), and the *Wisutskie* rule of conclusively against the weight of the evidence, *see, e.g., Lavoie v. Blake,* 106 N.H. 347, 349,

211 A.2d 414, 415 (1965); *Guptill v. Bergman,* 108 N.H. 507, 512, 240 A.2d 55, 59 (1968).

██ *Wisutskie* stands out, however, as the only case that has considered the merits of both the "conclusively against the weight of the evidence" and the *Belknap-Bennett* standards. Since *Wisutskie* favored the former standard, and since we find *Wisutskie's* reasoning persuasive, we consider *Wisutskie* the appropriate standard to employ in setting aside a verdict as against the weight of the evidence. Furthermore, if the trial court's finding that the verdict was conclusively against the weight of the evidence was a reasonable one, we will not disturb it on review. *Wisutskie,* 88 N.H. at 246, 186 A. at 771.

██ Before leaving our discussion of the law of setting aside verdicts as against the weight of the evidence, we wish to make two observations. First, the term "conclusively against the weight of the evidence" is hardly a self-explanatory one, and it is worth elaborating upon. The *Wisutskie* opinion, in enunciating its standard, did not mention the issue of a verdict's reasonableness. We think, however, that the guiding principle behind all cases on setting aside verdicts, regardless of the specific language any individual case might employ, is that the jury verdict must be an unreasonable one before the judge may set it aside. *See, e.g., Gilbert v. Desmarais,* 87 N.H. 150, 151–52, 175 A. 247, 248 (1934). Consequently, we believe the phrase "conclusively against the weight of the evidence" should be interpreted to mean that the verdict was one no reasonable jury could return.

██ Second, our rejection of elements such as mistake, partiality or corruption does not mean that those elements cannot form the basis of a motion to aside a verdict. *Wisutskie* itself stated that mistake can provide the grounds for setting aside a verdict. *Wisutskie,* 88 N.H. at 246, 186 A. at 771. Undoubtedly, it is possible to demonstrate that the jury made an affirmative mistake, as for example, by rendering internally inconsistent findings that manifest legal error. Similarly, the fact that the jury had been bribed would warrant setting aside a verdict on the basis of corruption. The crucial distinction is that in a motion to set aside a verdict because of mistake, partiality or corruption, the moving party must demonstrate the mistake, partiality or corruption as grounds independent of a verdict conclusively against the weight of the evidence. As a practical matter, it will often be easier to demonstrate that the verdict was conclusively against the weight of the evidence than it will be to demonstrate jury mistake.

Nonetheless, we wish to make it clear that we are not precluding inquiry into mistake, partiality or corruption as long as that inquiry is separate and apart from the question of evidentiary weight. Nor do we wish to preclude motions to set aside on the bases both that the jury erred, and that the verdict was conclusively against the weight of the evidence. Once again, as long as the jury error is considered as an independent ground, and not merely as descriptive of just how much the jury's determination was against the weight of the evidence, a dual inquiry into whether the jury was mistaken and whether the verdict was conclusively against the weight of the evidence is permissible.

Now that we have established the framework of analysis for this case, we proceed to review the trial court's decision to set aside the plaintiffs' verdicts. The court's order of April 15, 1986, stated that "[n]o evidence or exhibit was presented of lost wages, of doctor bills, of hospital bills, and of medicine bills." The court then noted that Loukia Panas' psychiatrists had testified to the quantity of time spent with Loukia Panas and their hourly rate for psychiatric care. Based on this testimony, the trial court concluded that the cost of the psychiatric services amounted to $5,160. The court consequently found that the jury awarded $994,840 to Loukia Panas for her psychological injuries and $100,000 to Nicholas Panas for his loss of consortium. The trial court concluded that these verdicts were "manifestly exorbitant and unreasonable, and [warranted] the belief that the jury had a mistaken view of the merits of the plaintiffs' case for damages."

The trial court did not refer to the weight of the evidence, essentially employing the language of *Belknap*. *Wisutskie* itself stated, however, that the *Belknap-Bennett* standard is not inconsistent with the "conclusively against the weight of the evidence" rule. Elements such as mistake, partiality, or corruption are merely illustrative of the underlying fact that the verdict was against the weight of the evidence. *Wisutskie*, 88 N.H. at 245–46, 186 A. at 771. From a theoretical standpoint, then, the trial court's application of *Belknap* does not necessarily render the court's decision fatal. If the trial court's analysis is consistent with *Wisutskie*, and that analysis arrived at a reasonable finding, then the trial court's finding will be upheld.

■ Although the trial court did not expressly find that the jury verdicts on damages were conclusively against the weight of the evidence, the court's decision was premised on an implicit finding that the jury's awards were indeed conclusively against the weight of the evidence. In particular, the trial court's determination that

the damages were excessive and exorbitant necessarily entails a finding that the evidence was insufficient to support rationally the full amount of damages awarded. Likewise, the court's determination that the jury had a mistaken view of the case rests on the unstated finding that the jury's verdicts conflicted with a reasonable construction of the weight of the evidence on the damages issue. The trial court thus succeeded in employing the proper analysis. We now turn to consideration of whether the court's analysis arrived at a reasonable conclusion.

An examination of the record reveals a substantial body of evidence in favor of the award of a certain level of compensation to Loukia Panas for her psychological trauma. The trial court admitted as much in a colloquy with counsel before disposing of the motion to set aside the verdicts. The question is whether the trial court acted reasonably in finding that the evidence produced could not reasonably support the full extent of the damages awarded. Loukia Panas testified that her apprehension by Harakis made her feel "lost," "embarrassed," as if she were "nothing," and that she had never felt worse. She also stated that even after the incident and her subsequent arrest, she felt upset, angry, and embarrassed that her children had seen her hauled off in a paddy wagon; that she wished she were dead, suffers from insomnia, has curtailed her activities outside of her home, and has ceased attending church services. The plaintiffs' medical experts testified that Loukia Panas suffered from post-traumatic stress syndrome, directly attributable to the K-Mart incident.

■    Although these psychological injuries and trauma should not be discounted, the trial court did not determine that Loukia Panas should not receive any compensation, only that her disagreeable experience and its after-effects did not warrant the award of a sum as great as $994,840. Significantly, Loukia Panas herself testified that she had returned to performing routine household chores, and her psychiatrists testified that her condition had improved upon taking medication which she later discontinued. In addition, the defendants' medical expert believed that her depression was caused by several serious personal events; e.g., two check-ups for cervical cancer, two miscarriages and a stroke suffered by her mother, that preceded the incident at K-Mart. In light of this countervailing testimony, we cannot say that the trial court's rejection of the jury's award was clearly erroneous.

■■ In support of the plaintiffs' argument that the trial court abused its discretion in setting aside the jury verdicts, the plaintiffs proffer a variety of arguments in addition to the main argument that the evidentiary weight favored the plaintiffs. First, the plaintiffs assert that the judge's intervention deprived the plaintiffs of their right to a jury trial under the Federal and New Hampshire Constitutions. The plaintiffs' argument at this point mischaracterizes the actual situation. The plaintiffs did receive a jury trial. The trial court, however, determined that the jury had arrived at an unreasonable result. Although jury trials are an all-important, constitutional, feature of our judicial system, the ability of the trial court to set aside unreasonable verdicts is also a well-recognized aspect of the administration of justice. *See, e.g., Gilbert,* 87 N.H. at 151–52, 175 A. at 248. In effect, the plaintiffs wish us to adopt a constitutional right to trial by an unreasonable jury. This is something we are unwilling to do.

■ In addition, the plaintiffs assert that the trial court erred in setting aside the jury verdicts without properly considering the economic value of Loukia Panas' lost earning capacity or lost homemaker services. It is true that the trial court did not consider, and properly so, the value of these services because the plaintiffs made no attempt to produce any evidence upon which the trier of fact could value compensation for Panas' lost earning capacity and homemaker services.

■ The plaintiffs also refer us to cases decided in the Federal District Court for the District of New Hampshire, in which jury verdicts have either equaled or exceeded one million dollars, to support a conclusion that the trial court in the instant case acted unreasonably when it set aside Loukia Panas' award. Our primary task on review, however, is to assess the reasonableness of the trial court's decision in light of the evidence presented below in this particular case. We have already found that the trial court could have reasonably decided to set aside the verdict for Loukia Panas, and we are not persuaded that different verdicts on the basis of different factual situations in other courts demonstrate that the trial court's determination here was unreasonable.

■ Continuing with our analysis of the plaintiffs' arguments on appeal, the plaintiffs assert that the trial court had no authority to set aside damages on a motion for remittitur. Our review of cases involving remittitur leads us to the conclusion that the plaintiffs' understanding of the law on this point is incorrect. In *Reid v. Spadone Machine Company,* 119 N.H. 457, 466, 404 A.2d 1094, 1100

(1979), this court stated that it is the duty of the trial court "to correct or vacate what turns out to be an unfair result" (quoting *Wisutskie*, 88 N.H. at 245, 186 A. at 770). The trial court decided to vacate the result by setting aside the verdict, and clearly possessed the authority to do so under *Reid*.

■■ Finally, we consider the plaintiffs' contention that the court abused its discretion in setting aside Nicholas Panas' $100,000 award for loss of consortium. A spouse's claim for damages based upon a loss of consortium is related to the injured spouse's claim, in that the nature and extent of the injured spouse's injuries are the material element in the disruption of the marital relationship. *See Seaman v. Berry*, 114 N.H. 474, 477, 322 A.2d 922, 923 (1974). We have already discussed the trial court's setting aside of the verdict as to Loukia Panas' award, and have determined that the decision to set aside that award was reasonable. Since the trial court could reasonably have concluded that Loukia Panas' psychological injuries were not of the nature to warrant the verdict, the court could also have reasonably concluded that the disruption to the marital relationship occasioned by Loukia Panas' psychological injuries was also insufficient to support Nicholas Panas' award of $100,000 for loss of consortium.

## II. *Liability and Damages Evidence in the New Trial*

The second general issue of this appeal pertains to the trial court's decision to grant a new trial on damages only. The plaintiffs assert that liability and damage issues are inextricably linked in intentional tort cases, and that removal of liability issues will undermine the force of any damage testimony offered in a future trial. The plaintiffs argue, consequently, that the trial court's decision denies them their right to a full and fair recovery under the New Hampshire Constitution, part I, article 14. Lastly, the plaintiffs argue that if a new trial on damages must be held, this court should determine what facts the plaintiffs will be able to present at a future trial.

■■ We respond by first noting that there is no State constitutional guarantee to a non-bifurcated trial. The trial court has the ability to order a new, partial trial "in order to fairly correct the errors [of the previous trial]," *Lisbon v. Lyman*, 49 N.H. 553, 604 (1870), and this decision to separate issues in a proceeding is within the sound discretion of the trial court. *See Jamestown Mut. Ins. Co. v. Meehan*, 113 N.H. 639, 641, 312 A.2d 689, 691 (1973). The plaintiffs' concerns that removal of liability issues will weaken

the testimony about damages are understandable, but exaggerated. We think a fairly clear distinction can be made between the responsibility of K-Mart and Harakis for Panas' injuries and the compensability of those injuries. This distinction does not unfairly prejudice the plaintiffs' case.

■■■ Given the trial court's implicit determination that the jury's verdict on liability was reasonable, a determination the plaintiffs do not challenge on appeal, a new trial on liability and damages would only waste judicial resources and unnecessarily burden the parties. Accordingly, the trial court did not abuse its discretion in ordering a new trial solely on the issue of damages. Lastly, we refuse to determine what facts the plaintiffs will be allowed to introduce at the damages trial. The decision as to the admissibility of particular evidence, which necessarily will include some of the evidence that is ordinarily admitted on the issue of liability, in the future trial must be left to the sound discretion of the trial court.

III. *Enhanced Compensatory Damages*

■■■ The next issue we address relates to the plaintiffs' assertion that the trial court erred in not properly instructing the jury on enhanced compensatory damages. This jurisdiction forbids the award of punitive damages. *Fay v. Parker*, 53 N.H. 342, 382, 397 (1872). "However, when the act involved is wanton, malicious, or oppressive, the compensatory damages awarded may reflect the aggravating circumstances." *Vratsenes v. N.H. Auto, Inc.*, 112 N.H. 71, 73, 289 A.2d 66, 68 (1972). Even if the trial court's instructions on enhanced damages were deficient, the deficiency was irrelevant given the trial court's setting aside of the verdict on damages, a decision we have already upheld as reasonable. Since we are affirming the order of a new trial on damages, the plaintiffs will have the opportunity to seek appropriate jury instructions under *Vratsenes supra* on the counts of malicious prosecution and slander, if the trial court deems appropriate.

IV. *Admissibility of Harakis' Criminal Convictions*

John Harakis was convicted in 1976 for attempted theft by deception, and in 1980 for impersonation of a police officer. The 1980 conviction arose from an incident at K-Mart when Harakis, while accusing a customer of shoplifting, falsely identified himself as a City of Manchester police officer. Harakis subsequently had the convictions annulled pursuant to RSA 651:5.

In a motion in limine, the plaintiffs sought to admit Harakis' criminal convictions in order to demonstrate: (1) that if K-Mart had investigated Harakis at the time of his application in 1978, K-Mart would have discovered his criminal record and should not have hired him; (2) that K-Mart was aware of Harakis' 1980 conviction and should have terminated him at that time; (3) negligence on the part of Harakis and K-Mart; and (4) Harakis' dishonesty, and to rebut his claims of honesty and integrity. In addition, the plaintiffs asserted that Harakis' criminal record was annulled either in whole or in part after the plaintiffs had placed the defendants on notice of their claims, and that the plaintiffs were entitled to introduce any evidence of criminal convictions that had not been annulled as of the date of the incident. The plaintiffs also filed a subsequent memorandum of law which elaborated on the motion in limine by stating that the criminal convictions should be admitted in order to verify whether K-Mart was aware, or should have been aware, of any unannulled convictions when Harakis was hired. The Trial Court (*Dalianis*, J.) ruled that RSA 651:5, V, VIII and X, pertaining to the annulment of criminal convictions, prohibited any disclosure of annulled criminal convictions.

On appeal, the plaintiffs assert that the trial court should have performed an *in camera* review of the dates of annulment for reasons similar to those advanced below: to elucidate K-Mart's negligence in hiring Harakis in the event that the 1976 conviction had not been annulled when K-Mart hired Harakis in 1978, and to ascertain whether any convictions had been annulled after the plaintiffs had placed the defendants on notice of their claims. Lastly, irrespective of the convictions' annulment dates, the plaintiffs assert that K-Mart was aware of the 1980 conviction, and it should have been admitted into evidence to demonstrate K-Mart's negligence.

RSA 651:5, V (effective until January 7, 1987) permits the annulment of a criminal conviction if the court determines that the annulment

> "will assist in the applicant's rehabilitation and will be consistent with the public welfare. Upon entry of the order, the applicant shall be treated in all respects as if he had never been convicted and sentenced, except that, upon conviction of any crime committed after the order of annulment has been entered, the prior conviction may be considered by the court in determining the sentence to be imposed."

RSA 651:5, VIII then provides that:

> "In any application for employment, license, or other civil right or privilege, or in any appearance as a witness in any proceeding or hearing, a person may be questioned about a previous criminal record only in terms such as 'Have you ever been arrested for or convicted of a crime that has not been annulled by a court?'"

█ █ When a statute is involved, our initial inquiry must address whether the statutory language covers the issue in question. In this instance, the breadth of the statutory language gives us little choice but to hold that the plaintiffs cannot insist on an *in camera* review of annulment dates in order to admit evidence of the convictions against Harakis. RSA 651:5, V states that "[u]pon entry of the order, the applicant shall be treated *in all respects* as if he had never been convicted and sentenced, except that, upon conviction of any crime committed after the order of annulment has been entered, the prior conviction may be considered by the court in determining the sentence to be imposed." (Emphasis supplied.) If the court is allowed to review dates of annulment of convictions, the applicant is no longer treated "in all respects" as if he had never been convicted, because the fact of an annulment also necessarily discloses the fact of a conviction.

The following illustration may serve as a good explanation of why we are reluctant to permit investigations into annulled convictions, given the statutory language in effect during the course of the instant case. RSA 651:5 only allows disclosure of convictions when a court is considering the sentence to be imposed. This means that law enforcement authorities cannot examine records of annulled convictions in investigations of criminal suspects. The only time such information becomes disclosable is after the suspect has been apprehended, tried and convicted. Considering the virtually absolute restrictions placed on disseminating information in criminal matters, where public policy considerations would militate in favor of limited disclosure of annulled convictions, it is an *a fortiori* proposition that the blanket restrictions on disclosure of convictions of RSA 651:5 should be applied rigorously in the context of civil suits.

In addition to seeking to admit Harakis' convictions against Harakis himself, the plaintiffs also sought to admit those convictions against K-Mart in order to demonstrate K-Mart's negligence in hiring, training, and retaining Harakis. It is not necessary for us to address the plaintiffs' arguments regarding this issue. To the extent that the plaintiffs claim error below, this argument is inapposite because the jury found negligence on the part of K-Mart,

and any error was harmless on the liability issue. The only possible manner in which admission of Harakis' criminal convictions might have changed the result below is if the jury had decided the existence of the convictions warranted an award of enhanced damages. The phrasing of the trial court's special questions, however, only allowed the jury to award liberal damages on the malicious prosecution and slander claims, and not on the negligence claims against K-Mart. No evidence exists in the record before us that the plaintiffs objected to the wording of the special questions. Consequently, we decline to reach the merits of the plaintiffs' assignment of error on the issue of the admissibility of Harakis' convictions against K-Mart.

V. *Admissibility of Facts and Circumstances Occasioning Harakis' Criminal Convictions*

Although the Trial Court (*Dalianis,* J.) did not admit Harakis' criminal convictions into evidence, it did allow introduction into evidence of underlying facts and circumstances that gave rise to Harakis' 1980 conviction for impersonation of a police officer. On this issue, it is the defendants who claim error for the following four reasons: (1) the underlying facts and circumstances are part of the annulled record; (2) the plaintiffs sought to admit the evidence for purposes of demonstrating Harakis' propensity to accuse unreasonably K-Mart customers, an impermissible purpose under New Hampshire Rule of Evidence 404; (3) evidence of other crimes is inadmissible for impeachment purposes under Rule 608, governing admissibility of evidence of specific acts of conduct, because Rule 608 expressly incorporates Rule 609(c), which prohibits use of evidence of an annulled conviction; and (4) the underlying facts of the conviction cannot be the subject of inquiry for impeachment purposes because the scope of questioning cannot extend beyond the extent of the actual conviction.

The determination of whether RSA 651:5 bars admission of the underlying facts and circumstances that gave rise to the conviction depends, once again, upon the statutory language. RSA 651:5, V only extends as far as evidence of the conviction itself: the applicant is to be treated as if the conviction had never occurred. Though the statute effectively erases the conviction, no such similar erasure is effected against the facts giving rise to the conviction. If, for example, Harakis had never been tried or convicted, the earlier incident itself would still be admissible against him under New Hampshire Rule of Evidence 405(b). It would be highly anomalous for us to allow RSA 651:5 to erase all evidence of an

incident that ultimately ended in a criminal conviction, and yet permit introduction of evidence of an incident that fortuitously did not culminate in a criminal conviction.

The defendants also refer us to RSA 651:5, VIII, which states:

> "In any application for employment, license or other civil right or privilege, or in any appearance as a witness in any proceeding or hearing, a person may be questioned about a previous criminal record only in terms such as: 'Have you ever been arrested or convicted of a crime that has not been annulled by a court?'"

The defendants link this paragraph with the following definition of "record": "[A] written memorial of all the acts and proceedings in an action or suit, in a court of record. The official and authentic history of the cause consisting in entries of each successive step in the proceedings, chronicling the various acts of the parties and of the court . . . intended to remain as a perpetual and unimpeachable memorial of the proceedings and judgment." BLACK'S LAW DICTIONARY 1438 (rev. 4th ed. 1968). In the defendants' view, then, "criminal record" under RSA 651:5, VIII includes the underlying facts and circumstances of a criminal proceeding. Even assuming, however, that Black's Law Dictionary is the proper authority under which to decide this issue, the definition of "record" from Black's does not encompass the underlying facts and circumstances of a criminal proceeding. "Record," according to Black's, is a "chronicl[e]" and "memorial" of the judicial proceedings, not of the incidents occasioning the proceedings. Consequently, we reject the defendants' first argument that RSA 651:5 prevents introduction of evidence of the incident that underlies the criminal conviction.

The defendants' second argument regarding the admissibility of the incidents underlying Harakis' convictions is that such evidence is excluded by New Hampshire Rule of Evidence 404 as evidence introduced for the impermissible purpose of showing Harakis' character or propensity to harass K-Mart customers. Scrutiny of Rule 404 is not necessary in the instant case, however, because the relevant line of inquiry at this point is not into the applicability of Rule 404, but rather into the applicability of New Hampshire Rule of Evidence 405. Rule 405(b) states:

> "*Specific Instances of Conduct*—In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."

██ In the proceedings below, the plaintiffs alleged that K-Mart had been negligent in hiring and supervising an employee who was untrustworthy and who displayed a negative characteristic of unjustifiably accusing K-Mart customers of shoplifting. Once Harakis' character had been called into question, Rule 405(b) enabled the plaintiffs to admit evidence of specific instances of conduct in which Harakis acted improperly. Certainly the 1980 incident, in which Harakis falsely represented himself as a police officer to a K-Mart customer, reflects on Harakis' character and improper job performance and was properly admissible into evidence. *See American Airlines, Inc. v. United States*, 418 F.2d 180, 197 (5th Cir. 1969) (prior inadequate performance in landing airplane under adverse conditions admissible to show employer's negligence in allowing this pilot to land aircraft).

Since we have determined that Rule 405 afforded a proper basis for admission of Harakis' relevant acts of misconduct as part of the plaintiffs' *case-in-chief*, it is not necessary to decide whether Rule 608 also affords a satisfactory basis to admit the evidence for *impeachment* purposes.

██ The last argument regarding the admissibility of the underlying facts and circumstances of Harakis' criminal convictions is made by the plaintiffs, who claim that the Trial Court (*Dalianis*, J.) erred in not admitting the underlying facts and circumstances of Harakis' 1976 conviction of attempted theft by deception. We agree with the trial court that the 1976 incident is clearly less probative on the issue of Harakis' improper job performance than the 1980 incident, in which Harakis accused a K-Mart customer of shoplifting: Harakis was a K-Mart employee in 1980, but not yet in 1976. Consequently, we do not believe the trial court abused its discretion in refusing to admit the facts and circumstances that gave rise to Harakis' 1976 conviction.

VI. *Declaration of Mistrial After Harakis Revealed his Criminal Convictions*

John Harakis was called as a plaintiffs' witness in the trial. At one stage in his testimony, the following colloquy by plaintiffs' counsel occurred:

"Q. Okay. Did you ever falsify any records in your employment as a security officer other than your applications that have been testified to here today, application for your license and application for your job at K-Mart?

A. No, sir.

Q. Never falsified any records while you worked for Filene's?

A. Oh, yes, sir.

Q. You falsified records at Filene's?

A. Yes, I did.

Q. What specifically did you do? What kind of misinformation did you put on your records?

A. As far as my arrest records was concerned from the Manchester Police Department and my diploma from high school.

Q. Specifically tell us about this record.

A. There was an incident that I impersonated a police officer, and there was an attempt of theft by deception on there.

Q. That's a theft by deception also?

A. Right.

Q. Did they find out about that?

A. I have no idea.

Q. But you falsified that information on Filene's application?

A. I placed that I didn't have a police record.

Q. And in fact you had a record on two offenses?

A. That's correct.

[defense attorney]: Objection, your Honor. May I approach the bench?

THE COURT: Yes. Why don't you take another five minutes or so recess.

(The jury takes a recess.)"

As can be seen from the above discussion, defense counsel was late in objecting to the line of questioning, even after it was clear that Harakis was disclosing information regarding his criminal background. Defense counsel had obtained a pre-trial ruling excluding evidence of Harakis' criminal record. Yet the record reveals, in a section other than that quoted above, that while defense counsel told Harakis that questions regarding his criminal convictions would not be raised, defense counsel did not explain why the court had made that determination. In effect, defense

counsel had not fully apprised Harakis of his rights under the annulment statute.

▮▮▮ It is within the discretion of a trial court to declare a mistrial if "some circumstance [exists] which indicates that justice may not be done if the trial continues to a verdict." *Mitchel v. Dover*, 98 N.H. 285, 286, 99 A.2d 409, 410 (1953). If, however, the error can be cured, no mistrial will be declared. *See Blais v. Town of Goffstown*, 119 N.H. 613, 619–20, 406 A.2d 295, 299–300 (1979) (reference to prior criminal proceedings involving plaintiff's husband cured by instructions to disregard). In the instant case, the court eventually instructed the jury to focus only on whether Harakis had committed any wrong while employed by K-Mart. This instruction, given the circumstances under which Harakis revealed his criminal record, effectively cured the prejudicial impact, and the trial court did not abuse its discretion in declining to declare a mistrial.

## VII. *The Merchant's Privilege Statute*

The defendants asked the court to give a jury instruction to the effect that RSA 627:8-a, if complied with by the defendants, would constitute a defense to all the plaintiffs' counts. The trial court declined to do so, instead instructing the jury that RSA 627:8-a would provide a defense only to the count of false imprisonment. The following three statutory provisions are relevant to this issue:

> "*Use of Force by Merchants.* A merchant, or his agent, is justified in detaining any person who he has reasonable grounds to believe has committed the offense of willful concealment or shoplifting, as defined by RSA 644:17, on his premises as long as necessary to surrender the person to a peace officer, provided such detention is conducted in a reasonable manner."

RSA 627:8-a.

> "*General Rule.* Conduct which is justifiable under this chapter constitutes a defense to any offense. The fact that such conduct is justifiable shall constitute a complete defense to any civil action based on such conduct."

RSA 627:1.

> "*Liability Limited.* No person shall incur any civil liability to another person by taking any action against such person which would constitute justification pursuant to RSA 627."

RSA 507:8-d.

The defendants assert that if the requirements of RSA 627:8-a are satisfied, the above statutory provisions constitute a complete defense to all civil causes of action, not just false imprisonment. Consequently, the trial court erred in not giving instructions to that effect regarding all of the plaintiffs' counts.

The weakness in the defendants' argument, for purposes of this case, is that RSA 627:8-a requires that the merchant, or his agent, have reasonable grounds to detain. The jury found that Harakis did not have reasonable grounds to detain Loukia Panas. Thus, even if the jury had been instructed on the operation of RSA 627:8-a as a defense to all counts, a reasonable jury could only have found that RSA 627:8-a was inapplicable. Consequently, the failure of the trial court to instruct the jury that RSA 627:8-a applied to all counts was harmless error, if error at all.

VIII. *Failure of the Trial Court to Strike Additional Negligence Counts*

The penultimate issue we dispose of requires a brief explication of some of the procedure below. The plaintiffs' original writs alleged, *inter alia*, intentional infliction of emotional distress. Additional counts were added, including counts of negligent infliction of emotional distress. The defendants filed a motion to dismiss these counts on the basis that New Hampshire does not recognize these causes of action. This motion was granted by the Trial Court (*Dalianis*, J.). At a later stage in the proceedings, the plaintiffs were allowed to add four additional negligence counts. Two of these were counts filed on behalf of Loukia Panas against Harakis and K-Mart. The count against Harakis alleged negligent performance of his security guard duties that caused the plaintiff "to be injured, to suffer mental and emotional distress, mental harm, and other damages all to the damage of the Plaintiff." The count against K-Mart alleged K-Mart's vicarious liability for Harakis' tortious conduct. Nicholas Panas also filed two counts, one against each defendant, alleging loss of consortium based on the detrimental impact on the Panas' marital relationship occasioned by Harakis' negligent performance of his duties and K-Mart's vicarious liability therefor.

On appeal, the defendants argue that the Trial Court (*Pappagianis*, J.) erred in not granting defendants' motion to dismiss on the basis that the additional negligence counts were restatements of the previous negligent infliction of emotional

distress counts. It is not necessary for us to reach the merits of this issue. Liability in the instant case was found against Harakis and K-Mart on the basis of counts other than the negligent performance claims in question here. In addition, the plaintiffs' attorney's opening remarks and the testimony elicited during the trial make it clear that the only injuries for which the plaintiffs sought compensation were emotional and psychological injuries. The plaintiffs made no attempt to apportion their request for damages for emotional distress according to the individual counts in question. Since liability has already been found on all counts for which emotional distress recovery is allowed to the extent proven, and since there can be no double recovery for damages, we hold that in the new trial on damages the jury should not be instructed on the count of negligent performance.

Although our holding does not require us to do so, we wish to make the observation that any future appeals on negligent infliction of emotional distress will have to address the issues of physical impact for liability purposes, and physical manifestation of emotional injuries for recovery purposes, if appropriate, as discussed in the following two cases: *Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979) and *Chiuchiolo v. New England &c. Tailors*, 84 N.H. 329, 150 A. 540 (1930).

## IX. *Jury Verdict on False Imprisonment Count*

The jury returned a verdict for the defendants on the plaintiffs' false imprisonment count. In particular, the jury found that, although Harakis did not have grounds to detain Loukia Panas from the objective standpoint of a reasonable person, he believed subjectively that he had grounds to detain under RSA 627:8-a, the merchant's privilege statute. Although their argument is opaque, the plaintiffs appear to assert that because RSA 627:8-a requires an objective standard, the jury misapplied the provision and the plaintiffs are entitled to judgments notwithstanding the verdicts on the false imprisonment counts.

The plaintiffs preserved this issue for appeal by filing a motion for judgment notwithstanding the verdict with the trial court, and the trial court denied the motion. The issue is raised for the first time on appeal in the plaintiffs' reply brief. We think it only reasonable to require that a reply brief may only be employed to reply to the opposing party's brief, and not to raise entirely new issues. If we held otherwise, we would be faced with either of two equally unacceptable results: the opposing party's inability to

respond in writing to the new issues raised by the reply brief, or the submission of a series of reply briefs until oral argument date as the parties scramble to respond to a sequence of *de novo* arguments and issues. In addition, a response to a new issue in a reply brief renders the original brief's filing deadline meaningless. In light of the above considerations, we will not reach the merits of this last issue.

*Affirmed.*

SOUTER, J., did not sit; the others concurred.